UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MARIN ALLIANCE FOR MEDICAL MARIJUANA, a not-for-profit association; JOHN D'AMATO, an individual, MEDTHRIVE, INC., a not-for-profit cooperative corporation doing business as MedThrive Cooperative; THE JANE PLOTITSA SHELTER TRUST, a revocable living trust; THE FELM TRUST, an irrevocable living trust; and THE DIVINITY TREE PATIENTS' WELLNESS COOPERATIVE, INC., a not-for-profit cooperative corporation, | Case No:  C 11-05349 SBA<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Dkts. 5, 23 |

Plaintiffs/Petitioners,

vs.

ERIC HOLDER, Attorney General of the United States; MICHELLE LEONHART, Administrator of the Drug Enforcement Administration; HON. MELINDA HAAG, U.S. Attorney for the Northern District of California,

Defendants/Respondents.

Three medical marijuana dispensaries, one of their landlords and a medical marijuana patient bring the instant action to challenge recent threats by the United States Department of Justice ("DOJ") to take legal action against landlords of medical marijuana dispensaries in the Northern District of California.  The parties are now before the Court on Plaintiffs' motion for a temporary restraining order ("TRO"), which seeks an immediate injunction to prevent the federal government from arresting, prosecuting, or otherwise

1   seeking sanctions or forfeitures against medical marijuana growers and providers who

2   operate under the auspices of California's Compassionate Use Act of 1996.  As will be set

3   forth below, binding Supreme Court and Ninth Circuit precedent foreclose Plaintiffs'

4   claims, and therefore, the Court DENIES Plaintiffs' motion for a TRO.[1]

5   **I.      BACKGROUND**

6        **A.      STATUTORY OVERVIEW**

7        The instant action arises from the tension that exists between federal and California

8   laws governing marijuana use.  Before turning to the substantive issues presented in

9   Plaintiffs' motion for TRO, it is useful to first review these distinct statutory frameworks.

10       **1.      The Federal Controlled Substances Act**

11       After taking office in 1969, President Nixon declared a national "war on drugs."

12  Gonzales v. Raich, 545 U.S. 1, 10 (2005) [hereinafter "Raich I"].  Shortly thereafter,

13  Congress passed the Comprehensive Drug Abuse Prevention and Control Act of 1970, also

14  known as the Controlled Substances Act ("the Act" or "CSA").  Pub. L. No. 91-513, 84

15  Stat. 1236.  "Enacted in 1970 with the main objectives of combating drug abuse and

16  controlling the legitimate and illegitimate traffic in controlled substances, the CSA creates a

17  comprehensive, closed regulatory regime criminalizing the unauthorized manufacture,

18  distribution, dispensing, and possession of substances classified in any of the Act's five

19  schedules."  Gonzales v. Oregon, 546 U.S. 243, 250 (2006).  The CSA places substances in

20  one of five classifications or schedules, see 21 U.S.C. § 812, "based on their potential for

21  abuse or dependence, their accepted medical use, and their accepted safety for use under

22  medical supervision," Gonzales, 546 U.S. at 250.  Substances listed in Schedule I are the

23  most restricted in terms of access and use, while those in Schedule V are the least restricted.

24  Id.  In enacting the CSA, "Congress was particularly concerned with the need to prevent the

25  diversion of drugs from legitimate to illicit channels."  Raich I, 545 U.S. at 12-13.

26

27  _____

28       [1] The Court adjudicates the instant motion without oral argument.  See Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b).

Marijuana is classified as a Schedule I substance under the Act, and therefore, is subject to the most restrictions.  See 21 U.S.C. § 812(c).  Although substances on Schedules II through V may be dispensed and prescribed for medical use, "[S]chedule I drugs cannot be dispensed under a prescription."  United States v. Oakland Cannabis Buyers' Co-op., 532 U.S. 483, 492 n.5 (2001) [hereinafter "Oakland Cannabis"].  The inclusion of marijuana on Schedule I reflects the federal government's determination that "marijuana has 'no currently accepted medical use' at all."  Id.  As such, the federal CSA makes it illegal to manufacture, distribute, or possess marijuana.  21 U.S.C. §§ 841, 844.  Further, it is illegal under the CSA to open, use, lease or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance.  Id. § 856(a)(1).  The only exception to these prohibitions is the possession and use of marijuana in federally-approved research projects.  Id. § 823(f).

### 2.    California's Compassionate Use Act

In contrast to the federal law, California law expressly authorizes the use of marijuana for medical purposes.  In 1996, California voters passed Proposition 215, known as the Compassionate Use Act of 1996, which permits seriously ill patients to obtain medical marijuana upon written or oral recommendation of a physician.  See Cal. Health & Safety Code § 11362.5.  The Compassionate Use Act provides, in part:

> (b)(1) The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows:
>
>  (A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.
>
> (B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.
>
> (C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable

distribution of marijuana to all patients in medical need of
marijuana.

Cal. Health & Safety Code § 11362.5(b)(1)(A)-(C).  In 2003, the California legislature
added the Medical Marijuana Program, id. §§ 11362.7-11362.83, to "address issues not
included in the CUA [i.e., Compassionate Use Act] so as to promote the fair and orderly
implementation of the CUA."  People v. Wright, 40 Cal. 4th 81, 85 (2006).

**B.    LEGAL DEVELOPMENTS**

The conflict between the federal CSA and California's Compassionate Use Act with
respect to the issue of medical marijuana has spawned several Supreme Court and Ninth
Circuit decisions, as well as other litigation.  These decisions are controlling with respect to
most of the claims alleged in the Amended Complaint filed in this action and otherwise
animate the Court's analysis of the issues presented in Plaintiffs' motion for TRO.  These
cases are summarized below.

**1.    Oakland Cannabis**

In January 1998, the United States brought an action under the CSA in the Northern
District of California against the Oakland Cannabis Cultivators Club ("the cooperative")
and its executive director seeking to enjoin them from distributing and manufacturing
marijuana.  Oakland Cannabis, 532 U.S. at 487.  Judge Charles Breyer granted the
Government's motion for preliminary injunction, and later denied the cooperative's motion
to modify the injunction to allow for the distribution of "medically necessary" marijuana.
Id.  The cooperative appealed, and the Ninth Circuit reversed and remanded the ruling on
the motion to modify the injunction.  Id. at 488.  The Ninth Circuit held that medical
necessity was a legally cognizable defense and the district court had mistakenly believed it
possessed no discretion to issue an injunction more limited in scope than the CSA.  Id.  In
addition, the Ninth Circuit found that the district court should have weighed the public
interest and considered factors such as the serious harm in depriving patients of marijuana
in deciding whether to modify the injunction.  Id.

The Supreme Court reversed the decision of the Ninth Circuit, holding that there is no medical necessity exception to the CSA's prohibitions on manufacturing and distributing marijuana.  Id. at 490.  In reaching its decision, the Court explained that a necessity defense is inapt where the legislature has made a "determination of values."  Id. With respect to the value of medical marijuana, the Court explained that Congress, in enacting the CSA, had made a legislative determination that "marijuana has no medical benefits worthy of an exception (outside the confines of a Government-approved research project)."  Id. at 491.  While some drugs may be dispensed for medical use, the same is not true for marijuana, which, for purposes of the CSA, has "no currently accepted medical use at all."  Id. (internal quotations omitted).  Additionally, the Court held that the Ninth Circuit erred in instructing the district court to consider "any and all factors that might relate to the public interest or the conveniences of the parties, including the medical needs of the cooperative's patients" because "[c]ourts of equity cannot, in their discretion, reject the balance that Congress has struck in the [CSA]."  Id. at 497-98.

## 2. Raich I

Four years after rendering its decision in Oakland Cannabis, the Supreme Court again addressed the interplay between the Compassionate Use Act and the CSA in Gonzales v. Raich, another case originating from this District.  In that case, plaintiffs-respondents—two California residents who, in accordance with their physician's recommendations used marijuana for serious medical conditions—sought injunctive and declaratory relief prohibiting enforcement of the CSA to the extent that it prevented them from possessing, obtaining, or manufacturing marijuana for their personal medical use. Raich I, 545 U.S. at 7-8.  They alleged that the CSA's categorical prohibition against the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes under California law exceeded Congress' authority under the Commerce Clause.  Id. at 8.  Judge Martin Jenkins denied the respondents' motion for preliminary injunction.  Id.  On appeal, the Ninth Circuit reversed and ordered the district court to enter the requested injunction on the grounds that

1   respondents had demonstrated a strong likelihood of success on their claim that, as applied

2   to them, the CSA is an unconstitutional exercise of Congress' Commerce Clause authority.

3   Id.

4        The Supreme Court reversed the Ninth Circuit and held that the legislature's

5   authority under the Commerce Clause includes the power to prohibit local cultivation and

6   use of marijuana.  Id. at 9.   The Court reasoned that the CSA was within Congress'

7   Commerce Clause power because production of marijuana, even if limited to home

8   consumption, "has a substantial effect on the supply and demand in the national market for

9   that commodity."  Id. at 19.  In the Supreme Court's view, the exemptions permitting

10  marijuana use under the Compassionate Use Act "will have a significant impact on both the

11  supply and demand sides of the market for marijuana," since they provide physicians with

12  an economic incentive to grant their patients permission to use the drug which, in turn, "can

13  only increase the supply of marijuana in the California market."  Id. at 31.  The Court

14  remanded the case to the Ninth Circuit for further proceedings consistent with its opinion.

15  Id. at 33.

### 3.   Raich II

16  

17       Following remand from the Supreme Court, plaintiff Raich ("Raich") renewed her

18  claims based on common law necessity, fundamental rights protected by the Fifth and

19  Ninth Amendments, and rights reserved to the states under the Tenth Amendment.  Raich v.

20  Gonzales, 500 F.3d 850, 857 (9th Cir. 2007) [hereinafter "Raich II"].[2]  The court

21  concluded that Raich had failed to meet her burden of establishing a likelihood of success

22  on these claims, and affirmed the district court's denial of her motion for preliminary

23  injunction.  Id.

24       In her common law necessity claim, Raich argued that the federal government was

25  precluded from enforcing the CSA against her because she faced a Hobson's choice of

26  

27       [2] In its initial decision, the Ninth Circuit did not reach any issues beyond the
    Commerce Clause.  Raich II, 500 F.3d at 856.  On remand, the court considered the
28  remaining arguments relating to the motion for preliminary injunction.  Id.

1    either complying with the CSA and enduring excruciating pain and possibly death—or

2    violating its provisions by using marijuana.  Id. at 858.  While acknowledging that Raich

3    had understandably chosen "the lesser evil" of using marijuana and had otherwise satisfied

4    the factual predicate for a necessity defense, the court questioned whether such a defense

5    remained legally viable after the Supreme Court's decision in Oakland Cannabis.  Raich II,

6    500 F.3d at 859-60.  Consequently, the court concluded that Raich's necessity claim "is

7    best resolved within the context of a specific prosecution under the [CSA]," as opposed to a

8    civil action seeking to enjoin enforcement of the CSA.  Id. at 860.

9        Next, the court considered Raich's claim for substantive due process under the Fifth

10   Amendment, which states that "[n]o person shall . . . be deprived of life, liberty, or

11   property, without due process of law[.]"  U.S. Const. amend. V.  Citing the two-step

12   approach enunciated in Washington v. Glucksberg, 521 U.S. 702, 719 (1997), the Raich II

13   court considered (1) whether the "right is deeply rooted in this nation's history and

14   traditions implicit in the concept of ordered liberty," and (2) "the description of the asserted

15   fundamental right."  Raich II, 500 F.3d at 862-63.  Considering the second step first, the

16   court found that it was constrained under Supreme Court precedent to "narrowly" identify

17   the right at stake.  Id. at 864.  Though Raich broadly described her right as one to "make

18   life-shaping medical decisions that are necessary to preserve the integrity of her body,

19   avoid intolerable physical pain, and preserve her life," the court concluded that Raich's

20   asserted right was more accurately characterized as "the right to use marijuana to preserve

21   bodily integrity, avoid pain and preserve her life."  Id. at 864 (emphasis in original).

22       The court then considered the question of whether Raich's asserted right was one

23   that was deeply rooted in United States' history and tradition and implicit in the concept of

24   ordered liberty.  Id.  To answer that question, the court looked to the Supreme Court's

25   landmark decision in Lawrence v. Texas, 539 U.S. 558 (2003), which involved a challenge

26   to a Texas state law that criminalized sodomy between consenting, adult homosexuals.  Id.

27   at 562-63; Raich II, 530 F.3d at 865-66.  Prior to Lawrence, the Supreme Court had upheld

28   Georgia's then-applicable sodomy statute, holding that there was no constitutionally

protected right for "homosexuals to engage in acts of consensual sodomy." Bowers v.

Hardwick, 478 U.S. 186, 192 (1986). The Lawrence court, however, observed that even if

a particular interest has not been deemed as fundamental in the past, "an emerging

awareness" of a liberty interest in modern times may require protection of an asserted right.

Lawrence, 539 U.S. at 572. The Court then pointed out that of the twenty-five states that

had laws criminalizing sodomy when it decided Bowers, only thirteen still had such laws

and a mere four enforced their laws only against homosexual conduct. Id. at 573. In those

states that maintained sodomy laws, "there [was] a pattern of nonenforcement with respect

to consenting adults acting in private." Id.

Raich argued that over the course of the last decade, there has been an "emerging

awareness of marijuana's medical value," as evidenced by the growing number of states

that have passed laws permitting the use of marijuana for medical reasons. Id. at 865. The

Ninth Circuit recognized the potential viability of Raich's argument, but ultimately found

that the right to use medical marijuana had not yet reached the point of being

"fundamental" and "implicit in the concept of ordered liberty." Id. at 866. While

acknowledging that since 1996 medical marijuana has been legalized in eleven states, the

court concluded that medical marijuana use had not "obtained the degree of recognition

today that private sexual conduct had obtained by 2004 in Lawrence." Id. at 865. The

Raich II court did note, however, that medical marijuana may attain similar status "sooner

than expected." Id. at 866.

Finally, the court addressed Raich's claim that the CSA infringes upon the State of

California's police powers, as conferred by the Tenth Amendment. Id.[3] The Ninth Circuit

agreed that the Compassionate Use Act is "aimed at providing for the health of the state's

citizens [and] appears to fall squarely within the general rubric of the state's police

powers"; nonetheless, the Court rejected Raich's contention that the CSA contravened the

---

[3] The Tenth Amendment states in its entirety as follows: "The powers not delegated by the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

Tenth Amendment.  Id. at 867.  The court found that "after Gonzales v. Raich, it would seem that there can be no Tenth Amendment violation in this case," and for that reason, concluded that "Raich [had] failed to demonstrate a likelihood of success on her claim that the [CSA] violates the Tenth Amendment."  Id.

### 4.    The Santa Cruz Lawsuit

During the pendency of the district court proceedings in Raich v. Ashcroft, N.D. Cal. No. C 02-4872 MJJ, the County of Santa Cruz and others filed suit in this Court seeking to enjoin various federal government defendants from conducting further raids or seizures against Plaintiff Wo/Men's Alliance for Medical Marijuana ("WAMM") and its member-patients, and from conducting raids or seizures against patients using marijuana for medicinal purposes in compliance with California's Compassionate Use Act within the City and County of Santa Cruz.  County of Santa Cruz v. Aschcroft, No. C 03-1802 JF [hereinafter "Santa Cruz"].   On January 25, 2010, the parties filed a Joint Stipulation of Dismissal Without Prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii).  Am. Compl. Ex. 5 at 4-6, Dkt. 21-5.  The stipulation states that "[a]s a result of the issuance of the Medical Marijuana Guidance, plaintiffs agree to dismiss the case without prejudice."  Id.

The "Medical Marijuana Guidance" attached to the stipulation is a memorandum from the United States Department of Justice ("DOJ"), dated October 19, 2009, prepared by then Deputy Attorney General David Ogden (the "Ogden memo").  The purpose of the Ogden memo, which is addressed to "SELECTED UNITED STATES ATTORNEYS," is to provide "clarification and guidance to federal prosecutors in States that have enacted laws authorizing the medical use of marijuana."  Id.  In pertinent part, the DOJ advises that:

> The prosecution of significant drug traffickers of illegal drugs, including marijuana, and the disruption of illegal drug manufacturing and trafficking networks, continues to be a core priority of the Department's efforts against narcotics and dangerous drugs, and the Department's investigative and prosecutorial resources should be directed towards these objectives.  As a general matter, pursuit of these priorities should not focus federal resources in your States on individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana.

Id. at 2.  The above notwithstanding, the DOJ explicitly states that: "This memorandum does not alter in any way the Department's authority to enforce federal law . . . [and] does not 'legalize' marijuana or provide a legal defense to a violation of federal law . . . . Rather, this memorandum is intended solely as a guide to the exercise of investigative and prosecutorial discretion." Id.

## C. THE INSTANT LAWSUIT

In late September and early October 2011, the United States Attorneys for each of the four federal districts in California contacted various entities involved in California's Medical Marijuana program, alleging that marijuana dispensaries, landlords who rent to dispensaries, patients and other supporting commercial entities are in violation of federal law. Am. Compl. ¶ 21.  By letters dated September 28, 2011, Melinda Haag, the United States Attorney for the Northern District of California, contacted landlords providing space to MAMM, Medthrive Cooperative ("Medthrive") and The Divinity Tree, notifying them that medical marijuana dispensaries are illegal under federal law and that they may be subject to "criminal prosecution, imprisonment, fines, and forfeiture of assets, including the real property on which the dispensary is operating." E.g., Am. Compl. Exs. 1-3.  The letters (hereinafter "Haag letters") warn:  "Please take necessary steps to discontinue the sale and/or distribution of marijuana at the above-referenced location within 45 days of this letter." Id.

In response to the Haag letters, MAMM and John D'Amato, a medical marijuana patient, filed suit in this Court on November 4, 2011 seeking to enjoin the Attorney General, the Administrator of the Drug Enforcement Agency, and the U.S. Attorney for the Northern District of California (collectively "Defendants") from arresting, prosecuting, or otherwise seeking sanctions or forfeitures against them and similarly situated medical marijuana growers and providers who operate in compliance with California state law. Compl., Dkt. 1.  They also seek a declaration that enforcement of the CSA is unconstitutional to the extent that it prevents Plaintiffs and similarly situated individuals from obtaining medical marijuana with a doctor's recommendation. Id.  Four days later on

1    on November 8, 2011, Plaintiffs filed a Motion for a TRO and Preliminary Injunction.  First

2    Mot. Prelim. Inj., Dkt. 5.[4]

3          On November 11, 2011, Plaintiffs filed an Amended Complaint adding four

4    plaintiffs—two additional dispensaries, Medthrive and The Divinity Tree, and Medthrive's

5    landlords, the Jane Plotitsa Shelter Trust and the Felm Trust.  Am. Compl. ¶¶ 9-12.[5]  Like

6    the original Complaint, the Amended Complaint alleges six claims for relief:  (1) judicial

7    estoppel, (2) equitable estoppel, (3) violation of the Ninth Amendment, (4) violation of the

8    Tenth Amendment, (5) violation of the Equal Protection Clause of the Fourteenth

9    Amendment, and (6) violation of the Commerce Clause.  Am. Compl. ¶¶ 24-52.  Along

10   with their Amended Complaint, Plaintiffs filed an Amended Motion for a TRO and

11   Preliminary Injunction.  Am. Mot. Prelim. Inj., Dkt. 23.  Pursuant to an agreement among

12   the parties, Defendants filed their Opposition to the TRO application on November 15,

13   2011.  Opp'n, Dkt. 31.  The matter has been fully briefed, and it is now ripe for

14   adjudication.   Dkt. 32.[6]

15

16          [4] On the same date that Plaintiffs filed this action, their counsel filed three virtually
     identical actions on behalf of different entities and individuals in the Eastern, Southern and
17   Central Districts of California.  See Sacramento Non-Profit Collective v. Holder, E.D. Cal.
     No. C 11-2939 GEB; Conejo Wellness Cntr. Coop. v. Holder, C.D. Cal. No. C 11-9200
18   DMG; Alternative Cmty. Health Care v. Holder, S.D. Cal. No. C 11-2585 DMS.  TRO
     motions were filed in the Central and Southern District actions.  On November 18, 2011,
19   Judge Dana Sabraw of the Southern District issued an order denying plaintiffs' application
     for a TRO.  Alternative Cmty. Health Care, No. C 11-2585 DMS, 2011 WL 5827200 (S.D.
20   Cal. Nov. 18, 2011).

21          [5] The Court also notes that at least one of the named Plaintiffs in this suit appears to
     be foreclosed from obtaining the requested relief in light of a previous order from Judge
22   Breyer of this Court permanently enjoining the MAMM "from engaging in the distribution
     of marijuana, the possession of marijuana with the intent to distribute, or the manufacture
23   of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1)."  See Opp'n
     Ex. A, Dkt. 31-1; see also Wash. Mut. Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir.
24   2011) ("Collateral estoppel, or issue preclusion, bars the relitigation of both issues of law
     and issues of fact actually adjudicated in previous litigation between the same parties.").

25
26          [6] The parties agreed that Defendants were to file an opposition only as to the TRO
     motion, and that following resolution of such request, they would meet and confer
27   regarding a briefing schedule with respect to the request for preliminary injunction.  See
     11/10/11 Letter, Dkt. 20.  Absent prior leave of Court, any further briefing in this matter
28   shall conform to the page limits set forth in the Civil Local Rules and this Court's Standing
     Orders.

## II.   LEGAL STANDARD

The same standard applies to a motion for a TRO and a motion for a preliminary injunction.  See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  To obtain a TRO or preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Under the Ninth Circuit's "sliding scale" approach, the first and third elements are to be balanced such that "serious questions" going to the merits and a balance of hardships that "tips sharply" in favor of the movant are sufficient for relief so long as the other two elements are also met.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  Nevertheless, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," Winter, 555 U.S. at 22, and the moving party bears the burden of meeting all four Winter prongs, see Cottrell, 632 F.3d at 1135; DISH Network Corp. v. FCC, 653 F.3d 771, 776-77 (9th Cir. 2011).

## III.   DISCUSSION

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1.   Judicial Estoppel

In their first claim for relief, Plaintiffs allege Defendants are judicially estopped from instituting any legal proceedings against them under the CSA in light of the stipulation of dismissal and attached Ogden memo filed in Santa Cruz.  Am. Compl. ¶¶ 24-27; Pls.' Am. Mem. Supp. Mot. Prelim. Inj. ("Pls.' Am. Mem.") at 12-13, Dkt. 27.  "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."  Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001).  Application of the doctrine is made on a case-by-case basis and is entrusted to the discretion of the Court.  See Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990).   Id.

As a threshold matter, it is entirely questionable whether the doctrine applies to Defendants in view of the inherent policy questions presented.  "[I]t is well settled that the Government may not be estopped on the same terms as any other litigant."  <u>Heckler v. Cmty. Health Servs., Inc.</u>, 467 U.S. 51, 60 (1984).  "[B]road interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests."  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 755 (2001) (internal quotation marks omitted).  This is particularly true where estoppel "would compromise a governmental interest in enforcing the law."  <u>Id.</u>  Here, Plaintiffs seek to estop Defendants from taking further action to enforce the CSA as it applies to medical marijuana in California.  This is precisely the type of circumstance in which the Supreme Court has counseled against applying the doctrine of judicial estoppel to the Government.  <u>See Heckler</u>, 467 U.S. at 60 ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.").

But even if Defendants were subject to judicial estoppel, Plaintiffs have failed to establish that the relevant factors justify its application in this instance.  Although the doctrine has no precise bounds, certain clear prerequisites exist for its application in a particular case.  <u>New Hampshire</u>, 532 U.S. at 750-51.  Specifically, in determining whether a party is subject to judicial estoppel, the court considers:  "(1) whether a party's later position is 'clearly inconsistent' with its original position; (2) whether the party has successfully persuaded the court of the earlier position; and (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair detriment on the opposing party.'"  <u>United States v. Liquidators of European Fed. Credit Bank</u>, 630 F.3d 1139, 1148 (9th Cir. 2011) (citations omitted).  Plaintiffs have failed to make a clear showing in support of these salient considerations.

First, there is no clear inconsistency between the Government's position in <u>Santa Cruz</u> and the actions threatened in the Haag letters.  According to Plaintiffs, the Government "entered a stipulation [in <u>Santa Cruz</u>] predicated on an announced change in

policy by the new administration and <u>promised</u> to abide by this new policy enunciated in the Medical Marijuana Guidance" such that "users and dispensers of medical marijuana operating in accordance with their state laws would no longer be prosecuted by the federal government under the CSA."  Pls.' Am. Mem. at 11, 13 (emphasis added).  The Government "promised" no such thing.  To the contrary, in the <u>Santa Cruz</u> stipulation, the parties explicitly agreed that the government reserved the right to "withdraw, modify, or cease to follow the [Odgen memo]," and, on that occasion, the <u>Santa Cruz</u> action could be reinstituted.  <u>See</u> Am. Compl. Ex. 5 at 3.  Indeed, the Ogden memo itself does not promise to forbear any future enforcement actions under the CSA and, in fact, explicitly states that the DOJ "does not alter in any way [its] authority to enforce federal law[.]"  <u>Id.</u> at 5.  Additionally, the memorandum makes clear that it was "intended solely as a guide to the exercise of investigative and prosecutorial discretion."  <u>Id.</u>[7]

Second, Plaintiffs have failed to show that Defendants successfully persuaded the district court in <u>Santa Cruz</u> to dismiss the action based upon any promise to indefinitely forego enforcement of the CSA against persons or entities involved in the production, sale or use of medical marijuana.  As noted above, the stipulation for dismissal expressly recites the possibility that Defendants could "withdraw, modify, or cease to follow the Medical Marijuana Guidance [i.e., the Ogden memo]" in which case the plaintiffs could reinstate their case.  Am. Compl. Ex. 5 at 2.  The parties filed their stipulation for dismissal under Federal Rule of Civil Procedure 41(a)(1)(ii), which provides that "the plaintiff may dismiss an action <u>without a court order</u> by filing: [¶] . . . a stipulation of dismissal signed by all parties who have appeared."  Fed. R. Civ. P. 41(a)(1)(ii) (emphasis added).  Although

---

[7] Notably, other federal courts reviewing the Ogden memo have rejected the argument that the memo embodies a "promise" by the federal government not to prosecute marijuana growers.  <u>See</u> <u>United States v. Stacy</u>, 734 F. Supp. 2d 1074, 1080 (S.D. Cal. 2010) ("No promise was made [in the Ogden memo] that the DEA would never raid medical marijuana dispensaries claiming to operate in compliance with state law or that individuals operating such dispensaries would not be prosecuted."); <u>United States v. Hicks</u>, 722 F. Supp. 2d 829, 833 (E.D. Mich. 2010) ("The Department of Justice's discretionary decision to direct its resources elsewhere [in the Ogden memo] does not mean that the federal government now lacks the power to prosecute those who possess marijuana.").

Judge Fogel countersigned the stipulation for dismissal, his approval was unnecessary for the dismissal to become effective.

Finally, Plaintiffs have failed to establish that Defendants gained an unfair advantage by virtue of submitting the Ogden memo as a basis for the stipulation for dismissal in Santa Cruz.  Since Plaintiffs were not parties to the Santa Cruz action, it is unclear how Defendants could have obtained any advantage over Plaintiffs based on their decision to send the Haag letters to their landlords.  See State of Ariz. v. Shamrock Foods Co., 729 F.2d 1208, 1215 (9th Cir. 1984) ("A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention.") (emphasis added and internal quotation marks omitted).  That aside, Plaintiffs overlook that the stipulation for dismissal filed in Santa Cruz permitted the plaintiffs in that action to reinstitute their lawsuit in the event the Government declined to follow the guidance set forth in the Ogden memo.  Thus, even if Plaintiffs herein had standing to assert any prejudice on behalf of the plaintiffs in Santa Cruz, it is clear that any alleged change in the Defendants' enforcement policy has not conferred an unfair advantage upon them.

In sum, the Court finds that Plaintiffs have failed to show the requisite likelihood of success on the merits of their judicial estoppel claim.

1

2.       **Equitable Estoppel**

2          Plaintiffs second claim is for equitable estoppel—specifically, estoppel by

3    entrapment—and avers that they reasonably relied on the Ogden memo as a basis for

4    leasing or continuing to lease their properties to medical marijuana operators.  Am. Compl.

5    ¶¶ 28-32; Pls.' Am. Mem. at 14 n.16.  Estoppel by entrapment is a defense in criminal

6    actions wherein a government official or agent leads a defendant into criminal conduct by

7    affirmatively misrepresenting what is legal.  See United States v. Tallmadge, 829 F.2d 767,

8    773 (9th Cir. 1987).  To succeed under this theory, the defendant must show "that the

9    government affirmatively told him the proscribed conduct was permissible, and that he

10   reasonably relied on the government's statement."  United States v. Ramirez-Valencia, 202

11   F.3d 1106, 1109 (9th Cir. 2000) (emphasis added).

12         Plaintiffs' estoppel by entrapment theory fails for at least three reasons.  First, the

13   doctrine has no application here because there is no allegation or evidence that any criminal

14   proceeding has been initiated against Plaintiffs.  Second, nothing in the Ogden memo

15   affirmatively informs medical marijuana growers and distributors that their conduct is legal.

16   To the contrary, the Ogden memo plainly states that "[t]his guidance regarding resource

17   allocation does not 'legalize' marijuana or provide a defense to a violation of federal

18   law[.]"  See Am. Compl. Ex. 5 at 5 (emphasis added).  Third, even if the Government had

19   affirmatively informed Plaintiffs that their conduct was legal—which it clearly did not—

20   any reliance on the Ogden memo would be unreasonable.  The memorandum was not

21   directed to landlords or the medical marijuana community in general; rather, it was directed

22   to various U.S. Attorneys, not as a statement of official policy, but "solely as a guide to the

23

24

25

26

27

28

exercise of investigative and prosecutorial discretion." Id.[8]  As such, Plaintiffs are hard

pressed to claim that it was reasonable to rely on a memorandum that was not even

addressed to them—and which unequivocally did not state that marijuana for medical

reasons was "legal."

Plaintiffs have thus failed to show the requisite likelihood of success on the merits of

their equitable estoppel claim.

### 3.    Due Process

Plaintiffs' third claim alleges that Defendants have violated their right to substantive

due process by threatening to seize their property and pursue civil and criminal sanctions

against them.  Am. Compl. ¶¶ 33-38.  The Ninth Amendment, in tandem with the Fifth

Amendment, protects fundamental rights and liberties "which are, objectively, 'deeply

rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered

liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"  Raich II,

500 F.3d at 862 (quoting Glucksberg, 521 U.S. at 720-21).[9]  As discussed, the Court's

evaluation of Plaintiffs' due process claim requires an examination of (1) the fundamental

right being asserted and (2) whether the "right is deeply rooted in this nation's history and

traditions implicit in the concept of ordered liberty[.]"  Id.

Here, Plaintiffs describe the fundamental rights at issue as the "rights to bodily

integrity that may not be interfered with by the federal government" and "to consult with

their doctors about their bodies and health."  Am. Compl. ¶¶ 37.  Plaintiffs' articulation of

---

[8] Moreover, once Plaintiffs received the Haag letters, which placed them on notice that their actions may violate the CSA and afforded them forty-five days to cease any medicinal marijuana-related activities, they were on notice to inquire further regarding the legality of their conduct.  As such, to the extent that Plaintiffs reasonably relied on the Ogden memo, such reliance was no longer reasonable after their receipt of the Haag letters.  See United States v. Weitzenhoff, 35 F.3d 1275, 1290 (9th Cir. 1993) (noting that in order to invoke a defense of estoppel by entrapment, "the defendant must show that he relied on the official's statement and that his reliance was reasonable in that a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.").

[9] Raich II is discussed in detail in the Background section of this Order at Section I.B.3

their asserted rights is virtually identical to rights which the plaintiff in <u>Raich II</u> sought to

vindicate.  <u>See</u> 500 F.3d at 864 ("[The plaintiff] asserts that she has a fundamental right to

'make life-shaping medical decisions that are necessary to preserve the integrity of her

body, avoid intolerable physical pain, and preserve her life.'").   In <u>Raich II</u>, the Ninth

Circuit held that the plaintiff's "careful statement" of her rights was flawed because

"[c]onspicuously missing from [her] asserted fundamental right is its centerpiece:  that she

seeks the right to use <u>marijuana</u> to preserve bodily integrity, avoid pain, and preserve her

life." <u>Id.</u> (emphasis in original).  As in <u>Raich II</u>, Plaintiffs' purported fundamental right

conspicuously omits any reference to "marijuana."  <u>See</u> Pls.' Am. Mem. at 16-18.  Thus,

<u>Raich II</u> compels the Court to construe Plaintiffs' asserted right narrowly as the right <u>to use</u>

<u>marijuana</u> in order to preserve the bodily integrity of medical marijuana patients.  <u>Id.</u>

    The second part of the <u>Glucksberg</u> test requires the Court to consider whether the

right to use marijuana to preserve bodily integrity is a right which is deeply rooted in this

nation's history and traditions implicit in the concept of ordered liberty.  <u>Raich II</u>, 500 F.3d

at 862.  Again, <u>Raich II</u> is directly on point:

> We agree with Raich that medical and conventional
> wisdom that recognizes the use of marijuana for medical
> purposes is gaining traction in the law as well.  <u>But that legal</u>
> <u>recognition has not yet reached the point where a conclusion</u>
> <u>can be drawn that the right to use medical marijuana is</u>
> <u>"fundamental" and "implicit in the concept of ordered</u>
> <u>liberty."</u> . . .  For the time being, this issue remains in "the arena
> of public debate and legislative action."
>
> As stated above, Justice Anthony Kennedy told us that
> "times can blind us to certain truths and later generations can
> see that laws once thought necessary and proper in fact serve
> only to oppress." . . . For now, federal law is blind to the
> wisdom of a future day when the right to use medical marijuana
> to alleviate excruciating pain may be deemed fundamental.
> Although that day has not yet dawned, considering that during
> the last ten years eleven states have legalized the use of medical
> marijuana, that day may be upon us sooner than expected.  <u>Until</u>
> <u>that day arrives, federal law does not recognize a fundamental</u>
> <u>right to use medical marijuana prescribed by a licensed</u>
> <u>physician to alleviate excruciating pain and human suffering.</u>

500 F.3d at 866 (emphasis added).

1    Plaintiffs argue that the "future day" envisioned in Raich II has arrived.  Pls.' Am.

2  Mem. at 23.  They insist that, much like the gradual elimination of state anti-sodomy laws

3  paved the way for the Lawrence Court's decision to overrule Bowers, five states and the

4  District of Columbia have enacted laws permitting the medical use of marijuana since the

5  Ninth Circuit rendered its decision in Raich II four years ago in 2007.  Id. at 6 n.7.  It is

6  quite clear, however, that the use of medical marijuana has not reached the "degree of

7  recognition . . . that private sexual conduct had obtained . . . in Lawrence."  Raich II, 500

8  F.3d at 865.  In Lawrence, only thirteen states continued to maintain anti-sodomy laws, and

9  there was an overall "pattern of nonenforcement with respect to consenting adults acting in

10 private."  539 U.S. at 573.  Although the number of jurisdictions that have medical

11 marijuana laws has increased by six, the fact remains that the majority of states do not

12 recognize the right to use marijuana for medicinal purposes.  Moreover, as to those states

13 that have not legalized medical marijuana, there is no allegation or evidence of a pattern of

14 non-enforcement of laws proscribing its use.  Finally—and significantly—it is difficult to

15 reconcile the purported existence of a fundamental right to use marijuana for medical

16 reasons with Congress' pronouncement that "for purposes of the [CSA], marijuana has no

17 currently accepted medical use at all."  Oakland Cannabis, 532 U.S. at 491; see also 21

18 U.S.C. § 812(b)(1) (classifying marijuana as a Schedule I drug with no approved medical or

19 other use).

20    In sum, the Court is bound by Raich II, which compels the conclusion that Plaintiffs

21 have failed to demonstrate a likelihood of success on their third claim for due process.

22              **4.    Tenth Amendment**

23    Plaintiffs' fourth claim alleges that Defendants' "threatened actions to raid, arrest,

24 prosecute, punish, seize medical cannabis of, forfeit property of, or seek civil or

25 administrative sanctions against" them violates California's state police powers in

26 contravention of the Tenth Amendment.  This claim is legally indistinguishable from the

27 Tenth Amendment claim which the Ninth Circuit considered and rejected in Raich II.  500

28 F.3d at 867 (holding that "after [Raich I], it would seem that there can be no Tenth

Amendment violation in this case."); see also United States v. Jones, 231 F.3d 508, 515 (9th Cir. 2000) ("We have held that if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment."). In a footnote, Plaintiffs attempt to dismiss the Raich II court's rejection of the plaintiff's Tenth Amendment claim as mere dicta. Pls.' Am. Mem. at 25 n.24. Their attempt to do so is entirely specious, as this clearly was a holding of the court—which is binding on this Court. See Zuniga v. United Can Co., 812 F.2d 443, 450 (9th Cir. 1987) ("District courts are, of course, bound by the law of their own circuit[.]"). Thus, as in Raich II, Plaintiffs have failed to show a likelihood of success on the merits of their Tenth Amendment claim.

### 5.   Equal Protection

Plaintiffs' fifth claim alleges that the actions threatened by Defendants in the Haag letters violate their right to equal protection. Am. Compl. ¶¶ 44-47. Specifically, they complain that Defendants are discriminating against "medical cannabis patients in California without a rational basis" because they (1) allow patients in the federal government's IND program[10] to receive medical marijuana and (2) have permitted patients in Colorado access to medical marijuana through state-licensed distributors. Id. ¶ 45. Plaintiffs allege that Defendants have no rational basis for "enforcing federal laws prohibiting cannabis possession and distribution" in California while simultaneously allowing medical marijuana to be used in the IND program and by Colorado patients. Am. Compl. ¶ 46; Pls.' Am. Mem. at 26.

"[T]he Due Process Clause of the Fifth Amendment subjects the federal government to constitutional limitations that are the equivalent of those imposed on the states by the Equal Protection Clause of the Fourteenth Amendment." Consejo De Desarrollo Economico De Mexicali, A.C. v. United States, 482 F.3d 1157, 1170 n.4 (9th Cir. 2007). "The Equal Protection Clause . . . is essentially a direction that all persons similarly situated

---

[10] The patients to which Plaintiffs refer are participants in the federal investigational new drug (IND) program who receive drugs under clinical investigation in a controlled study. See 21 U.S.C. § 355(b)-(d).

should be treated alike." <u>City of Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S. 432, 439 (1985); <u>Philips v. Perry</u>, 106 F.3d 1420, 1424-25 (9th Cir. 1997). "The requirements for a selective-prosecution claim draw on ordinary equal protection standards." <u>United States v. Armstrong</u>, 517 U.S. 456, 465 (1996). "To make a claim for selective prosecution, Plaintiffs must establish (1) that similarly situated persons were not prosecuted, and (2) that the defendants were motivated by a discriminatory purpose." <u>Lacey v. Maricopa Cty.</u>, 649 F.3d 1118, 1142 (9th Cir. 2011). Where no suspect class or fundamental right is involved, plaintiff must demonstrate that "there is no rational basis for the difference in treatment.'" <u>Squaw Valley Dev. Co. v. Goldberg</u>, 375 F.3d 936, 944 (9th Cir. 2004) (internal quotations omitted).

"A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." <u>United States v Lewis</u>, 517 F.3d 20, 27 (1st Cir. 2008) (citing <u>United States v. Armstrong</u>, 517 U.S. 456, 465 (1996)). Plaintiffs cannot make this showing. Unlike Plaintiffs, the IND participants have committed no crime because the CSA expressly allows marijuana use in connection with research projects funded by the Government. 21 U.S.C. § 823(f); <u>Oakland Cannabis</u>, 532 U.S. at 490 (noting that the CSA contains "but one express exception, and it is available . . . for Government-approved research projects."). Hence, IND participants are not "similarly situated" because, unlike Plaintiffs, their use of marijuana is expressly permitted by the CSA. <u>See</u> <u>United States v. Wilson</u>, 639 F.2d 500, 503 (9th Cir. 1981).

Likewise, Plaintiffs have not shown that they are similarly situated to medical marijuana users in Colorado. Plaintiffs aver that they are in the same position as medical marijuana dispensaries in Colorado, which, like those in California, are required to obtain licenses to operate. Pls.' Am. Mem. at 27. However, Plaintiffs fail to support these conclusory assertions with any evidence. But even if they had, Plaintiffs have not demonstrated that any alleged disparity in enforcement of the CSA by Defendants is attributable to any impermissible motive.

1    There is a "presumption that a prosecutor has acted lawfully."  <u>Reno v. Am.-Arab</u>

2  <u>Anti-Discrimination Comm.</u>, 525 U.S. 471, 489 (1999).  To overcome that presumption, a

3  criminal defendant must present "clear evidence" to the contrary.  <u>Id.</u>  Here, Plaintiffs assert

4  that the motivation to pursue landlords in California but not in Colorado must be illicit

5  because "there is no plausible basis for this disparity other than geography."  Pls.' Am.

6  Mem. at 28.  But the mere fact that Defendants have sent letters threatening legal action

7  under the CSA to persons in California, as opposed to Colorado, does not give rise to an

8  inference of improper motive.  <u>See</u> <u>Futernick v. Sumpter Township</u>, 78 F.3d 1051, 1056

9  (6th Cir. 1996) ("There is no right under the Constitution to have a law go unenforced

10  against you, even if you are the first person against whom it is enforced, and even if you

11  think (or can prove) you are not as culpable as some others who have gone unpunished.

12  The law does not need to be enforced everywhere to be legitimately enforced

13  somewhere[.]"), <u>overruled on other grounds by</u> <u>Village of Willowbrook v. Olech</u>, 528 U.S.

14  562 (2000).

15    Based on the record presented, the Court finds that Plaintiffs have failed to

16  demonstrate a likelihood of success on their claim for selective prosecution in violation of

17  the Fifth Amendment.

18    **6.    Commerce Clause**

19    In their final claim for relief, Plaintiffs allege that Defendants' attempt to regulate

20  the intrastate medical marijuana business violates the Commerce Clause.  Am. Compl.

21  ¶¶ 48-52.  This claim was categorically rejected by the Supreme Court in <u>Raich I</u>, which

22  held that Congress has a rational basis to regulate the purely intrastate manufacture and

23  possession of marijuana.  545 U.S. at 22.  For their part, Plaintiffs "acknowledge" the

24  "binding precedent" of <u>Raich I</u>, but insist that they find it "difficult to imagine that

25  marijuana grown only in California, pursuant to California State law, and distributed only

26  within California, only to California residents holding state-issued cards, and only for

27  medical purposes" could be subject to federal regulation under the Commerce Clause.  <u>Id.</u>

28  ¶ 51.  Irrespective of Plaintiffs' views on <u>Raich I</u>, this Court is bound by the Supreme

1    Court's decision.

2         Accordingly, the Court finds that Plaintiffs have failed to show a likelihood of

3    success on their claim under the Commerce Clause.

4         **B.    IRREPARABLE HARM**

5         The second prong of the <u>Winter</u> test for a TRO or preliminary injunction requires

6    that a party seeking immediate injunctive relief establish the likelihood, not merely the

7    possibility, of irreparable injury.  <u>Winter</u>, 555 U.S. at 22.  Injunctive relief is an

8    "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

9    entitled to such relief."  <u>Id.</u> (citing <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (per

10   curiam)).  Put differently, plaintiffs must demonstrate that "there exists a <u>significant threat</u>

11   of irreparable injury."  <u>Oakland Tribune, Inc. v. Chronicle Publ'g Co.</u>, 762 F.2d 1374, 1376

12   (9th Cir. 1985) (emphasis added).  "Speculative injury does not constitute irreparable

13   injury."  <u>Goldie's Bookstore v. Superior Court</u>, 739 F.2d 466, 472 (9th Cir. 1984).

14        As an initial matter, Plaintiffs suggest that they are entitled to a presumption of

15   irreparable harm based on their purported showing that Defendants violated their

16   constitutional rights.  Pls.' Am. Mem. at 30.  This argument is unavailing.  While the Ninth

17   Circuit has recognized that "[a]n alleged constitutional infringement will often alone

18   constitute irreparable harm," <u>see</u> <u>Goldie's Bookstore</u>, 739 F.2d at 472, such a presumption

19   is inapposite where, as here, the plaintiffs fail to demonstrate "a sufficient likelihood of

20   success on the merits of [their] constitutional claims to warrant the grant of a preliminary

21   injunction," <u>Assoc'd. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity</u>, 950 F.2d

22   1401, 1412 (9th Cir. 1991); <u>see also</u> <u>Beal v. Stem</u>, 184 F.3d 117, 123-24 (2d Cir. 1999)

23   ("the presence of irreparable injury turns on whether the plaintiff has shown a clear

24   likelihood of success on the merits.").  As discussed above, Plaintiffs' constitutional claims

25   are too tenuous to support a presumption of irreparable harm.  <u>See</u> <u>Goldie's Bookstore</u>, 739

26   F.2d at 472 (noting that while "[a]n alleged constitutional infringement will often alone

27   constitute irreparable harm . . .  the constitutional claim is too tenuous to support our

28   affirmance on that basis.").

Next, Plaintiffs allege that absent an immediate injunction, individual patients "who are served by their cooperatives will endure severe pain, spasms, and suffering and, nightmares, flashbacks, overwhelming anxiety, panic, seizures, nausea, life-threatening weight loss, malnutrition, cachexia, and starvation, and possibly other life-threatening problems such as tumors and paralysis—all constituting irreparabl[e] injury." Pls.' Am. Mem. at 30.[11]  Though conceding that any use of marijuana is illegal under federal law, Plaintiffs assert that marijuana is medically necessary for dispensary patients.  See D'Amato Decl. ¶ 6, Dkt. 13; Shaw Decl. ¶ 14, Dkt. 10; M. Breyburg Decl. ¶ 11, Dkt. 25; Pappas Decl. ¶ 11, Dkt. 28.  The insurmountable challenge for Plaintiffs, however, is that the Supreme Court has expressly held that courts may not consider the efficacy of medical marijuana as a basis for challenging the Government's enforcement of the CSA.  Oakland Cannabis, 532 U.S. at 491 (internal quotation marks and citations omitted).

In Oakland Cannabis, federal authorities sought to enjoin a Bay Area non-profit medical marijuana cooperative from distributing marijuana with a physician's authorization under the Compassionate Use Act.  The Supreme Court held that the cooperative's medical necessity defense was legally unavailable because Congress, in enacting the CSA, had made a legislative determination that marijuana has no medical benefits worthy of an exception outside the confines of a federal government-approved research project.  Oakland Cannabis, 532 U.S. at 491.  In the Supreme Court's view, "for purposes of the Controlled Substances Act, marijuana has 'no currently accepted medical use' at all." Id. (citing 21 U.S.C. § 812).  Notably, the Court went on to hold that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation," and thus, is bound by "the balance that Congress has struck in the [CSA]."  Id. at 497-98.

---

[11] Plaintiffs' assertion that immediate injunctive relief is necessary to avoid irreparable harm is contravened by the fact that they filed their request for emergency relief over a month after receiving the Haag letters.  E.g., Dahl v. Swift Distrib. Inc., 2010 WL 1458957, at *4 (C.D.Cal. Apr. 1, 2010) (finding that eighteen-day delay in filing TRO application "implies a lack of urgency and irreparable harm.").

1    Subsequently in <u>Raich I</u>, the Supreme Court found that a patient's reliance on a

2    physician's recommendation, even if sanctioned under the Compassionate Use Act, does

3    not alter Congress' finding that marijuana has no medical value.  545 U.S. at 27.  "The

4    CSA designates marijuana as contraband for <u>any</u> purpose; in fact, by characterizing

5    marijuana as a Schedule I drug, Congress expressly found that the drug has no acceptable

6    medical uses."  <u>Id.</u> (emphasis in original).  Thus, this Court expresses no view as to whether

7    medical marijuana is effective in ameliorating pain or discomfort for some patients.  As

8    discussed, this Court is bound by the foregoing Supreme Court decisions which legally

9    nullify Plaintiffs' claim of irreparable harm.

10   **C.    BALANCE OF EQUITIES**

11   With regard to the third requirement under the <u>Winter</u> test for preliminary injunctive

12   relief, Plaintiffs argue that the balance of equities, sometimes referred to as the balance of

13   hardships, "tilts sharply" in their favor because patients will experience "extreme suffering

14   and pain" without access to medical marijuana.  Pls.' Am. Mem. at 30.  This argument fails

15   for the same reasons expressed above; to wit, Congress has concluded—rightly or

16   wrongly—that marijuana provides no medical benefit.  <u>See</u> <u>Oakland Cannabis</u>, 532 U.S. at

17   491 ("for purposes of the [CSA], marijuana has no currently accepted medical use at all.")

18   (internal quotation and citation omitted)); <u>Raich I</u>, 545 U.S. at 27 (finding that marijuana

19   has no legally cognizable uses even when used under direct medical supervision).  In other

20   words, the only hardship articulated by Plaintiffs is one that federal courts may <u>not</u>

21   consider.  <u>See</u> <u>Oakland Cannabis</u>, 532 U.S. at 499 (holding that the court cannot consider

22   evidence of medical necessity where enforcement of the CSA is challenged).  As for

23   Plaintiffs' contention that Defendants will suffer "absolutely no hardship" if a TRO were

24   granted, <u>see</u> Pls.' Am. Mem. at 30, it ignores the federal Government's interest in ensuring

25   enforcement of its laws.  <u>See</u> <u>Heckler</u>, 467 U.S. at 60.  Thus, the Court finds that Plaintiffs

26   have not established that the balance of equities tip in their favor.

27   **D.    PUBLIC INTEREST**

28   The final step in the <u>Winter</u> analysis requires the Court to consider whether a TRO

- 25 -

or preliminary injunction is in the public interest.  555 U.S. at 20.  Plaintiffs maintain that

"[t]here is an undeniable public interest in the availability of a doctor-recommended

treatment . . . ."  Pls.' Am. Mem. at 30.  As a general proposition, Plaintiffs are correct—

but not all treatments are <u>legally</u> available.  Although the public has a general interest in

having access to doctor-recommended treatments, the public <u>also</u> has a corresponding

interest in being protected from treatments that either have not been sanctioned by the

requisite authorities or are explicitly proscribed because of any number of harms.

The question here is whether there is a public interest in the availability of medical

marijuana as a doctor-recommended treatment.  "The public interest may be declared in the

form of a statute."  <u>Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco</u>, 512 F.3d

1112, 1127 (9th Cir. 2008) (internal quotation marks omitted).  Where the elected branches

have enacted a statute based on their understanding of what the public interest requires, this

Court's "consideration of the public interest is constrained[,] for the responsible public

officials … have already considered that interest."  <u>Id.</u> at 1126-27.  Thus, as set forth above,

Congress clearly and unequivocally concluded in enacting the CSA that there is no public

interest in the use marijuana for medical reasons.  <u>See</u> 21 U.S.C. § 812(b)(1).  To that end,

the Supreme Court in <u>Oakland Cannabis</u> has forbidden courts from considering the whether

the public's interest will be furthered by access to marijuana for medical purposes, since

Congress has already made that determination.  532 U.S. at 497.

IV.   **<u>CONCLUSION</u>**

The Court finds that Plaintiffs have neither demonstrated a likelihood of success on

the merits of any of their claims nor have they demonstrated that they will suffer

immediate, irreparable harm in the absence of a TRO.  The Court is sensitive to the desires

of individuals to use medical marijuana with a doctor's recommendation, as permitted by

California law.  Nonetheless, marijuana remains illegal under federal law, and in Congress'

view, it has no medicinal value.  The claims which Plaintiffs seek to advance in this lawsuit

are foreclosed by Supreme Court and Ninth Circuit Court of Appeals precedent, which bind

this Court and constrain its discretion to grant the immediate injunctive relief they request. Accordingly,

IT IS HEREBY ORDERED THAT:

1.      Plaintiffs' motion for a TRO is DENIED.

2.      The parties shall meet and confer regarding the submission of further briefing in connection with Plaintiffs' motion for preliminary injunction and submit their proposed schedule to the Court in the form or a stipulation and proposed order (or administrative motion, if no stipulation is reached) within five (5) days of the date this Order is filed.

3.      This Order terminates Docket 5.

IT IS SO ORDERED.

Dated:  November 28, 2011

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge